725 S.E.2d 681

**HOOK POINT, LLC, Respondent,**

v.

**BRANCH BANKING AND TRUST COMPANY, First Reliance Bank, and Allan Risinger, Defendants,**

Of Whom Branch Banking and Trust Company is, Appellant.

No. 27115.

Supreme Court of South Carolina.

Heard March 21, 2012.

Decided April 11, 2012.

Rehearing Denied May 24, 2012.

Frank R. Ellerbe, III, and Wilson W. McDonald, both of Robinson, McFadden & Moore, of Columbia, for Appellant.

Frederick A. Gertz, of Gertz & Moore, of Columbia, Thornwell F. Sowell and David C. Dick, both of Sowell, Gray, Stepp & Laffitte, of Columbia, for Respondent.

Justice PLEICONES.

Respondent Hook Point, LLC (Hook Point) was granted a preliminary injunction preventing Appellant Branch Banking and Trust Company (BB & T) from drawing on, and defendant First Reliance Bank (First Reliance) from honoring, a $1.5 million letter of credit. BB & T appeals. We reverse.

## FACTS

In late 2007, Hook Point sought a loan from BB & T for the purpose of developing a subdivision on property Hook Point owned on Lake Murray called Panama Pointe. BB & T issued a commitment letter to Hook Point in September 2007 indicating that it would loan the company $5.1 million and establish a $2 million line of credit to enable Hook Point to develop the subdivision. Security for the loan included a first mortgage on the Panama Pointe property, personal guarantees of Hook Point's four principals, and a $1.5 million standby letter of credit issued by First Reliance in favor of BB & T.

Hook Point applied to and obtained a letter of credit (LC) from First Reliance that named BB & T as beneficiary.[1] The LC was secured by a cash deposit at First Reliance of approximately $310,000, several real properties owned by a Hook Point affiliate, and personal guarantees of the Hook Point principals. Under the terms of the LC, BB & T was permitted to make draws upon presentation of a draft accompanied by

1) The original letter of credit. 2) A notarized, sworn statement by the Beneficiary, or an officer thereof, that: a) The Borrower has failed to perform its obligations to the Beneficiary under the Loan Agreement and Promissory Note dated November 16, 2007, executed by and between [Hook Point and BB & T] b) The amount of the draft does

---

1. A person who applies for a letter of credit is the applicant (in this case, Hook Point). The bank that issues the LC on behalf of the applicant is the issuer (First Reliance Bank). The entity that has the right to draw on the LC is the beneficiary (BB & T).

not exceed the amount due to the Beneficiary under the obligations; and; [sic] c) The signer has the authority to act for the Beneficiary with regard to the Letter of Credit.

The loan from BB & T to Hook Point was finalized in a loan agreement on the same day the LC was issued. Hook Point proceeded to complete infrastructure work in the development and began construction on the first home before determining that market conditions had become unfavorable to the project as originally contemplated. Hook Point defaulted on the Loan Agreement and related notes and loan documents by, among other things, failing to pay property taxes, to make interest payments due under the notes, or to pay the principal due under one note. BB & T gave Hook Point notice of default in September 2010 and accelerated the loans under the terms of the Loan Agreement on December 21, 2010. On the same day, BB & T tendered a demand letter to First Reliance, seeking to draw the full amount of the LC.

On December 23, Hook Point filed suit alleging several causes of action against BB & T, including for fraudulent misrepresentation by which BB & T induced Hook Point to enter the loan agreement. Hook Point admitted to being $70,000 in arrears on interest but argued that the terms of the agreement did not permit BB & T to draw the full amount of the LC if that exceeded the amount of interest due. It also sought an ex parte temporary restraining order preventing First Reliance from honoring a draft on the LC by BB & T, which the court granted. After a hearing, the court also granted a preliminary injunction against drafts on or honor of the LC beyond amounts of accrued interest, requiring extension of the LC for one year, and requiring Hook Point to post a $50,000 bond with the court. This appeal followed, and the case was transferred to this Court pursuant to Rule 204(b), SCACR.

## ISSUE

Did the circuit court err when it granted a preliminary injunction?

## STANDARD OF REVIEW

 The grant of an injunction is reviewed for abuse of discretion. *Strategic Resources Co. v. BCS Life Ins. Co.*, 367

S.C. 540, 544, 627 S.E.2d 687, 689 (2006). "An abuse of discretion occurs when the decision of the trial court is unsupported by the evidence or controlled by an error of law." *Peek v. Spartanburg Reg'l Healthcare Sys.*, 367 S.C. 450, 454, 626 S.E.2d 34, 36 (Ct.App.2005).

## DISCUSSION

BB & T contends that the circuit court erred when it granted the preliminary injunction. We agree.

■ "A preliminary injunction should issue only if necessary to preserve the status quo ante, and only upon a showing by the moving party that without such relief it will suffer irreparable harm, that it has a likelihood of success on the merits, and that there is no adequate remedy at law." *Poynter Investments, Inc. v. Century Builders of Piedmont, Inc.*, 387 S.C. 583, 586–87, 694 S.E.2d 15, 17 (2010).

On the second element, likelihood of success on the merits, BB & T argues that the grounds for refusing to honor a letter of credit are exceedingly narrow and that Hook Point has failed to show it is likely to succeed on the merits under that standard. Thus, BB & T argues that the circuit court erred when it found that Hook Point had sufficiently established this element. We agree.

A letter of credit is a financial instrument designed to reduce the need for counterparties in a transaction to trust one another by adding an intermediary bank to the transaction. This intermediary bank extends credit to one party (typically the buyer in a sales transaction [2]) so that the other need not do so. In a sales transaction, the letter of credit typically requires a seller to represent that he has shipped goods under a sales contract and to document this representation with a bill of lading in order to draw on the LC provided by the buyer. This arrangement entails risk to the buyer, who is vulnerable to loss should the seller present fraudulent documents or deliberately ship nonconforming goods. Never-

---

**2.** Courts do not distinguish between types of LCs for purposes of analyzing whether a court should grant an injunction against honoring them. *See New York Life Ins. Co. v. Hartford Nat'l Bank & Trust Co.*, 173 Conn. 492, 499–500, 378 A.2d 562, 566 (Conn.1977).

theless, the usefulness of a letter of credit depends on its being the virtual equivalent of cash. The judicial doctrine that has developed around letters of credit reflects courts' understanding of this background and the importance to commerce of respecting the terms of this financial instrument so that it remains available as a reliable means of shifting financial risk.

Specifically, this understanding is embodied in the independence principle, under which courts recognize that the obligations created in the letter of credit are independent of the obligations of the underlying contract. *See, e.g., Intraworld Industries, Inc. v. Girard Trust Bank,* 461 Pa. 343, 357, 336 A.2d 316, 323 (Pa.1975) ("The primary purpose of a letter of credit is to provide assurance to the seller of goods ... of prompt payment upon presentation of documents. A seller who would otherwise have only the solvency and good faith of his buyer as assurance of payment may, with a letter of credit, rely on the full responsibility of a bank. Promptness is assured by the engagement of the bank to honor drafts upon the presentation of documents. The great utility of letters of credit flows from the independence of the issuer-bank's engagement from the underlying contract between beneficiary and customer. Long-standing case law has established that, unless otherwise agreed, the issuer deals only in documents. If the documents presented conform to the requirements of the credit, the issuer may and must honor demands for payment, regardless of whether the goods conform to the underlying contract between beneficiary and customer."); *Itek Corp. v. First Nat'l Bank of Boston,* 730 F.2d 19 (1st Cir.1984) (Breyer, J.) ("Parties to a contract may use a letter of credit in order to make certain that contractual disputes wend their way towards resolution with money in the beneficiary's pocket rather than in the pocket of the contracting party. Thus, courts typically have asserted that such letters of credit are 'independent' of the underlying contract.... And they have recognized that examining the rights and wrongs of a contract dispute to determine whether a letter of credit should be paid risks depriving its beneficiary of the very advantage for which he bargained, namely that the dispute would be resolved while he is in possession of the money." (citations omitted)); *Roger J. Johns and Mark S. Blodgett, Fairness at the Expense of Commercial Certainty: The International Emergence of Un-*

*conscionability and Illegality As Exceptions to the Independence Principle of Letters of Credit and Bank Guarantees,* 31 N. Ill. U.L.Rev. 297, 309 (2011) ("[T]he common concern among all stakeholders is that as the ease with which letters of credit ... can be enjoined increases their commercial utility decreases.").

Nevertheless, courts have carved out a very narrow exception to the independence principle. Aside from permitting the intermediary bank to refuse to honor forged documents presented in order to draw on the letter of credit, courts enjoin the payment of LCs for "fraud in the transaction" when "the beneficiary's conduct has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served." *Itek,* 730 F.2d at 25 (internal quotation marks and citations omitted).

Put simply, the cases in which the "fraud in the transaction" exception has been applied are those in which the underlying transaction or the demand for payment is clearly a sham, and it is apparent that rigid adherence to the independence principle would facilitate what amounts to a scheme to defraud. In the case that established the fraud in the transaction exception, the beneficiary made an actual shipment so that the shipping documents were real, but substituted "rubbish" in place of salable bristles. *Sztejn v. J. Henry Schroder Banking Corp.,* 177 Misc. 719, 31 N.Y.S.2d 631 (Sup.Ct.1941). In another leading case, the beneficiary was not permitted to collect on the LC because the fall of the Iranian government so altered conditions that the contract for military equipment could not be completed, and thus there was no possibility that the original purpose of the transaction of which the LC was a part could be accomplished. In addition, no other legal recourse was available to the applicant, and the applicant had cancelled the underlying contract in compliance with its force majeure provisions, which called for cancellation of the LC upon cancellation of the underlying contract. *Itek, supra.*

Several other cases also illustrate the narrowness of the fraud in the transaction exception. *See Intraworld Industries, Inc. v. Girard Trust Bank,* 461 Pa. 343, 357, 336 A.2d 316, 325 (Pa.1975) ("We conclude that, if the documents presented by [the beneficiary of the LC] are genuine in the sense

of having some basis in fact, an injunction must be refused.... [N]either the trial court nor this Court may attempt to determine [the beneficiary's] actual entitlement to payment under the lease."); *see also Roman Ceramics Corp. v. Peoples Nat. Bank,* 714 F.2d 1207, 1209 (3d Cir.1983) (permitting issuing bank to dishonor LC when it knew underlying invoice had been paid and that contrary certification was false); *Dynamics Corp. of Am. v. Citizens & S. Nat. Bank,* 356 F.Supp. 991, 999 (D.C.Ga.1973) (describing court's role as limited to ensuring that the defendant could not "run off with plaintiff's money on a *pro forma* declaration which has absolutely no basis in fact"); *Mid–America Tire, Inc. v. PTZ Trading Ltd.,* 95 Ohio St.3d 367, 392, 768 N.E.2d 619, 641 (Ohio 2002) (affirming injunction against honor of LC where defendants repeatedly lied to and misled plaintiffs about the tires available for sale in order to pressure them into making the LC available before they "could discover the truth").

The Uniform Commercial Code (UCC) incorporated this judicially developed doctrine into Article 5, the UCC formulation of the law governing letters of credit. Thus, South Carolina's adoption of the UCC incorporated into South Carolina law the same independence principle and narrow exception limiting the enjoinment of payment of LCs to instances of egregious fraud that operates to vitiate the entire transaction. In particular, UCC Article 5, S.C.Code §§ 36–5–101 through – 119, governs letters of credit. S.C.Code Ann. § 36–5–109(b) (2003) sets forth the conditions under which a court may enjoin honor of a letter of credit as follows, in relevant part:

> If an applicant claims that a required document is forged or materially fraudulent or that honor of the presentation would facilitate a material fraud by the beneficiary on the issuer or applicant, a court of competent jurisdiction may temporarily or permanently enjoin the issuer from honoring a presentation or grant similar relief against the issuer or other persons only if the court finds that:
>
> . . .
>
> (3) all of the conditions to entitle a person to the relief under the law of this State have been met; and

(4) on the basis of the information submitted to the court, the applicant is more likely than not to succeed under its claim of forgery or material fraud....

For purposes of a preliminary injunction, subsection (3) effectively incorporates the requirements of the common law related to injunctions generally: that the movant show that irreparable harm will result and that no adequate remedy at law exists if the court refuses the injunction. *Poynter Investments, supra.*

Subsection (4) codifies not only the general common law requirement that the movant show a likelihood of success on the merits but also the special rule for letters of credit allowing only a narrow exception for fraud in the transaction, as discussed above. The Official Comment makes this codification explicit.[3]

In the present case, Hook Point argues that BB & T is not entitled to draw on the LC because the commitment letter

---

3. The Official Comment states:

Material fraud by the beneficiary occurs only when the beneficiary has no colorable right to expect honor and where there is no basis in fact to support such a right to honor. The section indorses articulations such as those stated in *Intraworld Indus. v. Girard Trust Bank,* 461 Pa. 343, 336 A.2d 316 (1975), *Roman Ceramics Corp. v. Peoples Nat. Bank,* 714 F.2d 1207 (3d Cir.1983), and similar decisions and embraces certain decisions under Section 5-114 that relied upon the phrase "fraud in the transaction." Some of these decisions have been summarized as follows in *Ground Air Transfer v. Westates Airlines,* 899 F.2d 1269, 1272–73 (1st Cir.1990):

We have said throughout that courts may not "normally" issue an injunction because of an important exception to the general "no injunction" rule. The exception, as we also explained in *Itek,* 730 F.2d at 24–25, concerns "fraud" so serious as to make it obviously pointless and unjust to permit the beneficiary to obtain the money. Where the circumstances "plainly" show that the underlying contract forbids the beneficiary to call a letter of credit, *Itek,* 730 F.2d at 24; where they show that the contract deprives the beneficiary of even a "colorable" right to do so, *id.,* at 25; where the contract and circumstances reveal that the beneficiary's demand for payment has "absolutely no basis in fact," *id.;* see *Dynamics Corp. of America,* 356 F.Supp. at 999; where the beneficiary's conduct has "so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served," *Itek,* 730 F.2d at 25 (quoting *Roman Ceramics Corp. v. Peoples National Bank,* 714 F.2d 1207, 1212 n. 12, 1215 (3d Cir.1983) (quoting *Intraworld Indus.,* 336 A.2d at 324–25)); then a court may enjoin payment.

described the LC as "to be used as last resort for interest carry." Hook Point also seeks to construe as fraudulent BB & T's demand on the LC. The LC, however, by its terms requires only that BB & T represent that "[t]he Borrower has failed to perform its obligations ... under the Loan Agreement and Promissory Note" and that "[t]he amount of the draft does not exceed the amount due to the Beneficiary under the obligation." Thus, contrary to Hook Point's arguments, the plain language of the LC permitted BB & T to use it if Hook Point defaulted under any obligation of the loan agreement and note, including an acceleration clause. Furthermore, no term in the loan agreement or note to which the LC refers limits BB & T's use of the LC to interest due. Thus, it is incontrovertible that BB & T had some basis in fact for the representations it made when it drew on the LC.

If there is any validity to Hook Point's argument that the commitment letter limited the utilization of the LC exclusively to interest, that is an ordinary contract dispute that raises no implication of fraud by BB & T sufficient to trigger the narrow fraud exception. *Dynamics Corp.*, *supra.* In fact, $500,000 had been reserved by BB & T from the original $5.1 million loan for the purpose of drawing down interest carry. A more plausible explanation for the "last resort" language in the commitment letter is that it was intended merely as an accommodation to the principals that BB & T would not seek to draw on the LC for interest until the reserve had been exhausted. That language, whatever it meant, is a red herring in this case as the draw on the LC was sought not only to recoup interest but as a result of multiple defaults that caused BB & T to invoke the acceleration of the entire debt.

Indeed, Hook Point's admission that BB & T was entitled to any draw on the LC for past due interest was conclusive as to the issue whether honor of the LC should be enjoined, since BB & T's entitlement to past due interest is alone some basis in fact on which BB & T could demand payment under the LC. Moreover, the strict standard required under § 36–5–109(b)(4) is that the alleged fraud vitiate the entire transaction, that is, it deprives Hook Point of any benefit from the transaction. In this case, there is no dispute that Hook Point received $5.1 million from BB & T. These facts hardly parallel

the receipt of "rubbish" instead of bargained-for salable bristles. *See Sztejn v. J. Henry Schroder Banking Corp., supra.*

Thus, there is no evidence Hook Point is more likely than not to succeed on a claim of material fraud so egregious as to vitiate the entire transaction as required under § 36–5–109(b)(4), and the circuit court failed to evaluate the evidence under the strict standard required for injunctions against the honor of LCs. Under the proper standard, it is clear that BB & T had a sufficient basis in fact upon which to demand payment under the LC. Thus, the circuit court's finding was based upon an error of law.

Because this issue is dispositive of the case, we need not address BB & T's remaining issues. Rule 220(b), SCACR; *e.g., Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999).

## CONCLUSION

The standard under which a fraud in the transaction claim must be measured when deciding whether to enjoin honor of a letter of credit requires that the beneficiary have no colorable claim or basis in fact for asserting its rights under the letter of credit. In this case BB & T has, in our view, not only a colorable claim but an undeniable basis in fact for asserting its rights under the letter of credit. Therefore, the circuit court erred when it granted the preliminary injunction. **REVERSED.**

TOAL, C.J., BEATTY, HEARN, JJ., and Acting Justice JAMES E. MOORE, concur.